FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX.
FT. WORTH DIVISION

2010 MAR -5 PM 12: 28

CLERK OF COURT

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| DARYL MAYES, individually and on behalf of all others similarly situated, | § § § | |
| Plaintiff, | § § | **4-10 CV - 157 - Y** |
| v. | § § | CASE NO._____ |
| JPMORGAN CHASE BANK, N.A., and WASHINGTON MUTUAL BANK, | § § § | |
| Defendants. | § | **JURY DEMAND** |

**PLAINTIFF'S ORIGINAL CLASS ACTION COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Daryl Mayes, Plaintiff in the above entitled and numbered matter, complaining of JPMorgan Chase Bank, N.A. ("Chase") and its recently acquired division Washington Mutual Bank ("WAMU") (collectively "Defendants"), and for such complaint, would respectfully show the Court as follows:

I.

**PARTIES**

1.    Plaintiff Daryl Mayes ("Plaintiff" or "Mayes") is a resident of Arlington, Tarrant County, Texas.

2.    Defendant JPMorgan Chase Bank, N.A. is a national banking association with its main office located at 1111 Polaris Parkway, Columbus, OH 43240. Chase is one of the country's largest banks and has offices and branches in Texas throughout the country.  Chase is authorized to do business in the State of Texas and can be served with process by serving its registered agent in Texas: CT Corporation System, 350 North Saint Paul St., Dallas, Texas 75201.

3.    Defendant Washington Mutual Bank: WAMU is a national banking

1

association with its main office located at 2273 North Green Valley Parkway, Henderson, Nevada, 89014. On September 25, 2008, the United States Office of Thrift Supervision seized WAMU from its holding company, Washington Mutual, Inc., and placed WAMU into the receivership of the Federal Deposit Insurance Corporation ("FDIC"). The FDIC sold the banking subsidiaries, minus unsecured debt or equity claims, to Chase for $1.9 billion. Chase specifically assumed "all mortgage servicing rights and obligations of" WAMU, including WAMU's HELOC accounts. Defendant Chase operates and controls WAMU as a subsidiary and/or division of Chase.

II.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(d)(2). This Complaint alleges claims on behalf of a class of homeowners who are minimally diverse from Defendants. On information and belief, the aggregate of these claims exceeds the sum or value of $5,000,000. This Court further has federal question subject matter jurisdiction under 28 U.S.C. § 1331 as this action arises in part under Regulation Z of the Truth-in-Lending Act, 15 U.S.C. § 1647, 12 C.F.R. § 226.5(b). This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

5. Defendant Chase is a national banking association whose main offices are in Ohio, and is considered a citizen of Ohio for the purposes of diversity jurisdiction under 28 U.S.C. § 1348 and *Wachovia Bank v. Schmidt*, 546 U.S. 303 (2006).

6. Defendant WAMU is a national banking association whose main office is located in Nevada, and is considered a citizen of Nevada for the purposes of diversity jurisdiction under 28 U.S.C. § 1348 and *Wachovia Bank*, 546 U.S. 303.

7. Venue is proper before this Court under 28 U.S.C. § 1391(b)(2), as Plaintiff's property is located in this District and a substantial part of the events, circumstances, and/or omissions giving rise to these claims occurred in this District.

III.

## THE NATURE OF THE COMPLAINT

8.     This is a class action lawsuit arising out of Defendants' scheme to systematically suspend and/or reduce the available credit balance on home equity lines of credit ("HELOCs") previously issued to Texas residents in direct breach of their respective HELOC agreements, and in violation of state and federal law.

9.     The purpose and intended result of Defendants' scheme and systematic practices was the liquidation of one of the risk elements of Defendants' loan portfolio: HELOCs sold to Texas residents that were secured by a mortgage on the borrowers' real property located in Texas.

10.     More specifically, starting in approximately spring 2008, Defendants have been sending a form letter to thousands of their Texas HELOC customers, including Plaintiff, summarily lowering their lines of credit. (*See* "Important Information About Your Home Equity Line of Credit" received by Plaintiff, a true and accurate copy of which is attached as an Exhibit A.)

11.     The letter stated:

> With home values continuing to fall in many parts of the country, a recent review of your account identified a decline in the value of the property securing your HELOC since the date you applied for your HELOC or increase. Therefore, the account has been suspended from additional advances effective [insert the date].

(Ex. A)

12.     The letter further stated that if homeowners disagreed with Defendants' valuation, they could order and pay for an appraisal conducted by a company of Defendants' choosing. (Ex. A) The letter did not disclose the initial value of the property, the current "updated" value, the amount by which the property has supposedly decreased, the methodology used to compute the decline in home value, or the property value that Defendants would require in order to reinstate the credit line.

13.     Defendants lacked a sound factual basis for sending these letters to their

3

HELOC customers and suspending their customers' HELOCs. Defendants knowingly and intentionally used faulty automated formulas with unreliable and inaccurate analyses, data, equations, and processes that are vulnerable to manipulation, including but not limited to faulty Automated Valuation Models ("AVMs"), to unreasonably undervalue homes so as to falsely trigger Defendants' right to suspend the HELOCs. Furthermore, Defendants intentionally ignored Regulation Z's definition of significant decline in value and instead used their own triggering events to purportedly gain the right to freeze HELOC accounts or reduce credit limits. As a result, Defendants, in violation of federal law, suspended the HELOCs of many Texas homeowners, including Plaintiff, whose property values had not declined significantly within the meaning of Regulation Z, if at all.

14. While federal law permits lenders to suspend the HELOCs if an individual property securing a HELOC significantly declines in value, it is unlawful to reduce the credit limits or suspend the accounts without first assessing the value of the collateral that secures each affected HELOC or having a sound factual basis for the suspension or reduction. It is also unlawful to use triggering events (i.e., circumstances defined under Regulation Z the occurrence of which allows lenders to reduce credit limits or suspend HELOC accounts) in a manner inconsistent with Regulation Z. Therefore, Defendants' intentional and systematic suspension of HELOCs based on unreasonably faulty AVMs, their intentional and systematic concealment of its processes, standards and requirements for suspending or reinstating such accounts or credit limits, and their failure to have a sound factual basis for their HELOC suspensions and reductions, were inconsistent with Regulation Z and were and remain unlawful.

IV.

**EVENTS PERTAINING TO PLAINTIFF AND THE CLASS**

15. In November 2006, Plaintiff entered into a contract with WAMU which provided Plaintiff with a $17,000 HELOC. (*See* WAMU Equity Plus Texas Agreement

4

and Disclosure ("HELOC Agreement") attached to this complaint as Exhibit B.) The terms and conditions of the HELOC Agreements were common and typical as to each member of the putative Class. WAMU's HELOC was fully secured by a mortgage on Plaintiff's home in Arlington, Texas ("Subject Property") which was appraised at the time of the HELOC origination at $172,000.

16.     At the time of the HELOC origination, the balance on Plaintiff's first mortgage, also held by WAMU, was $120,310. Accordingly the total amount of unencumbered equity in the Subject Property at the time of the HELOC origination was $34,690:

**$172,000 (home value) - $17,000 (HELOC) - $120,310 (first mortgage) = $34,690.**

17.     Therefore, at the time of the HELOC origination, the ratio of total combined loans to home value ("CLTV") was 80%.

18.     Plaintiff's HELOC funds were primarily for personal, family, and household purposes, including home renovations.

19.     Sometime in late March 2009, Plaintiff received a letter from Defendants indicating that they had suspended Plaintiff's HELOC from future draws effective March 26, 2009. The letter stated that the suspension was due to the fact that "a recent review of your account identified a decline a the value of the property securing your HELOC" and that "a proven valuation method" showed that the new "valuation no longer supports the amount of your Line of Credit." (Ex. A.) Nowhere in the letter did it say what that new valuation was or what the purported decline in home value was, the method used to determine the new value.

20.     Defendants offered an appeals process if the HELOC borrower wanted to dispute the unidentified valuation. In that case, the HELOC borrower was directed to order and pay for an on-site appraisal performed by the company of Defendants' choosing and forward it to Defendants with request for reinstatement. (Ex. A.) Nowhere

5

in the letter did Defendants state what home value was needed to achieve reinstatement.

21.     Following the receipt of the letter, Plaintiff telephoned Defendants' customer service and requested an explanation and information regarding his HELOC suspension. Plaintiff considered appealing the suspension but needed to know material information to decide whether to expend time and resources on the appeal, since the appraisal fee was not refundable. The customer service representatives, however, were unhelpful and could not provide any meaningful answers to Plaintiff such as the value needed for reinstatement or how that value was obtained.

22.     After repeated telephone calls from Plaintiff, Defendants finally sent Plaintiff a Collateral Valuation Report (the "Valuation Report") that showed that sometime in March 2009, an AVM determined the Subject Property value to be $151,000. (The Valuation Report is attached to this Complaint as an Exhibit C.)  The Valuation Report specifically stated that it was based solely on electronic records and that it had not been prepared by a licensed appraiser. (Ex. C.)

23.     Upon receiving the Valuation Report, Plaintiff immediately called Defendants' customer service and disputed this unreasonably low valuation. On March 16, 2009 – 10 days prior to receiving the notice of his HELOC suspension – a full exterior and interior appraisal of the Subject Property had been conducted by an independent licensed appraisal company for the purposes of refinancing Plaintiff's first mortgage. The appraisal report revealed the home value to be $165,000, which is $14,000 or nearly 10% more than Defendants' AVM rendered at essentially the same time. Nothing happened to the subject matter premises within the time of the two valuations that would suggest the property suddenly lost $14,000 in value.

24.     Over the next several months, Plaintiff placed six more calls to the Defendants' customer service. During those calls, the customer service representatives agreed that Plaintiff's home value was $165,000 but nevertheless refused to reinstate

his HELOC claiming that Defendants' new policy required a CLTV ratio of 70% (as compared to a police of 80% at the time of the origination of Plaintiff's HELOC) and that Plaintiff's CLTV ratio did not comply with the new standard.

25.     Unable to achieve reinstatement of his HELOC, on October 22, 2009, Plaintiff filed a complaint with the Office of the Comptroller of the Currency ("OCC"), which was forwarded by the OCC to Defendants.

26.     On December 8, 2009, Defendant Chase responded to the OCC complaint and sent Plaintiff a letter, again denying reinstatement of his HELOC. (See the December 8, 2009 letter attached to this Complaint as Exhibit D.) The December 8 letter stated that while Chase had received and reviewed an independent appraisal report of the Subject Property submitted by Plaintiff, the reinstatement was not warranted because Chase's new CLTV ratio mandates a maximum CLTV limit of 70% and Plaintiff's CLTV ratio does not satisfy this new standard due to the purported decline in the value of the Subject Property. (Ex. D.)

27.     Despite the disparity in property value between Defendants' AVM and the actual appraisal of the property, despite the fact that no sound factual basis existed for the suspension of Plaintiff's HELOC in the first place (given that there was only a 4%, or $7,000, decline in property value), and despite the fact that the HELOC Agreement between WAMU and Plaintiff did not allow such a suspension, Defendants have not reinstated Plaintiff's HELOC.

28.     Defendants took the above actions despite Regulation Z's provision that allows lenders to suspend HELOCs only when the unencumbered equity in the collateral property of the borrower has decreased by 50%. 12 C.F.R. § 226.5(b)(f)(3). In this case, Plaintiff has paid over $6,000 into his first mortgage since the HELOC origination. Thus, as Plaintiff's first mortgage lender, Defendants knew or should have known that Plaintiff's first mortgage balance was $114,094 at the time of the HELOC suspension.

29.     In fact, at the time of the HELOC suspension in March of 2009, an unencumbered equity in the Subject Property had decreased by only 2.2% (or $784), from $34,690 at the time of the HELOC origination to $33,906:

**$165,000 (home value) - $17,000 (HELOC) - $114,094 (first mortgage balance** *at the time of the HELOC suspension*) = $33,909.

30.     Defendants acted unlawfully even without regard to Plaintiff's paydown of his first mortgage. Even without considering the increase in equity caused by the $6,000 paydown, the equity in the Subject Property has decreased by only 20% (or $7,000), from the $34,690 present at account origination, to $27,690:

**$165,000 (home value) - $17,000 (HELOC) - $120,310 (first mortgage balance** *at the time of the HELOC origination*) = $27,690.

31.     In either case, the decrease in Plaintiff's unencumbered equity was not significant within the meaning of Regulation Z. Further, no provision of the HELOC Agreements allowed Defendants to suspend their HELOCs based on the change in the Defendants' CLTV policy. The adequacy of Defendants' collateral was never at issue, nor reasonably could it be. In effect, Defendants have repudiated their HELOCs in direct violation and breach of their HELOC Agreements and TILA and Regulation Z.

## VI.

## CLASS ACTION ALLEGATIONS

32.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and b(3) of the Federal Rules of Civil Procedure of behalf a Class consisting of:

> all Texas residents who had a HELOC account with Chase and/or WAMU that was secured by real property located in Texas where Chase reduced or suspended the HELOC based on the claim that the customer's home value had significantly declined in value.

Excluded from the Class are 1) any Judge or Magistrate presiding over this action and their family members; 2) Defendants, Defendants' subsidiaries, parent companies, successors, predecessors, and any entity in which Defendants have a

controlling interest, and their current or former officers and directors; 3) persons who properly execute and file a timely request for exclusion from the Class; and 4) the legal representatives, successors or assigns of any such excluded persons.

33.     Members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Defendants sent their boilerplate notice of the HELOC suspension to hundreds of Texas residents summarily suspending or reducing their HELOCs.  During the suspension period, Defendants unlawfully suspended or reduced the Texas residents' HELOCs in a consistent and uniformed fashion.  Members of the Class could be easily identified from HELOC records maintained by Defendants and/or their subsidiaries, divisions, and agents, and all Class members can be notified of the pendency of this action by mail and publication, using forms of notice similar to those customarily used in consumer class action lawsuits.

34.     Plaintiff's claims are typical of the claims of the other members of the Class.  Plaintiff and the Class had previously applied for and obtained a HELOC from WAMU and/or Chase under the standard form of a HELOC Agreement, and have sustained damages as a result of Defendants' unlawful suspensions and reductions of the HELOCs, as alleged in this Complaint.

35.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Questions of law and fact common to the Class include:

A.      Whether Defendants' criteria for suspending and reducing their HELOCs were lawful;

B.      Whether Defendants' internal policies and procedures, existing at the time when Plaintiff's and the Class members' HELOC agreements were in effect, incorporated a plan to create and rely on pretextual reasons to suspend or reduce the HELOCs of Plaintiff and the Class members,

C.    Whether Defendants' methods for valuing the properties securing the HELOCs were lawful;

D.    Whether Defendants' suspension of the HELOCs, including the notice provided with respect to such suspension, violated TILA and Regulation Z;

E.    Whether Defendants' suspension of the credit limits breached the terms of their HELOC agreements with Class members;

F.    Whether Defendants' notice of the HELOC suspensions was improper and/or violated Regulation Z;

G.    Plaintiff and the Class members are entitled to relief, and the nature of such relief.

36.    Plaintiff has retained counsel competent and experienced in class and consumer litigation and intends to vigorously prosecute this action. The interests of the Class will be fairly and adequately protected by Plaintiff. Plaintiff has no interests that are contrary to or in conflict with those of the Class that Plaintiff seeks to represent.

37.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

A.    Given the limited resources of Class members, the complexity of the issues involve in this action, and the size of individual Class members' claims, few, if any, Class members could afford to seek legal redress individually for the wrongs Defendants committed against them.

B.    When the liability of Defendants has been adjudicated, claims of all members of the Class can be determined by the Court.

C.    The class action will cause an orderly and expeditious administration of the Class claims, economies of time, effort and expense will be fostered, and uniformity of decisions will be ensured.

D.    Without a class action, the Class members will continue to suffer damages and Defendants' wrongful conduct will continue without a real remedy or a deterrent.

E.    Plaintiff knows of no difficulty that will be encountered in the management of this action that would preclude its maintenance as a class action. Much of the information needed for administrative purposes relative to identity of the Class and calculation of damages are available from Defendants through their computerized records.

## COUNT I: DECLARATORY RELIEF UNDER TILA AND REGULATION Z

38.     Plaintiff re-alleges paragraphs 1 through 43 of the Complaint as if fully set forth herein.

39.     TILA and Regulation Z prescribe standards of conduct by which a HELOC may be terminated, suspended or reduced by an originating bank. As a general rule, TILA and Regulation Z prohibit Defendants from changing any of the terms of an existing HELOC agreement, including the credit limit. 15 U.S.C. § 1647(c)(1); 12 C.F.R. § 226.5b(f)(3). An exception permits lenders to suspend HELOCs during "any period in which the value of the consumer's principal dwelling which secures any outstanding balance is significantly less than the original appraisal value of the dwelling." 15 U.S.C. § 1647(c)(2)(B); 12 C.F.R. § 226.5b(f)(3)(vi)(A).

40.     The Federal Reserve Board's Official Staff Commentary to Regulation Z ("the Official Staff Commentary") defines "significant decline" for purposes of § 226.5b(f)(3)(vi)(A) as a decline in home value so that "the initial difference between the credit limit and the available equity (based on the property's appraised value . . . ) is reduced by fifty percent." The Official Staff Commentary further states that Regulation Z "does not require a creditor to obtain an appraisal before suspending credit privileges [but] a significant decline must occur before suspension can occur." Under the official guidance issued by the Office of Thrift Supervision, lenders would violate Regulation Z if they "reduce the credit limits of all HELOC accounts in a geographic area in which real estate values are generally declining without assessing the value of the collateral that secures each affected HELOC account." *Office of Thrift Supervision: Guidance on Home Equity Lines of Credit*, OTS 08 038 (Aug. 26, 2008) (emphasis in the original). Instead, in direct violation of the above regulations, Defendants suspended and reduced the Class members' HELOCs without having sound factual basis for doing so and where the properties that secured the HELOCs did not significantly decline in value.

A.    **Defendants use unreasonable and grossly inaccurate valuation methods.**

41.    Before suspending or reducing the limits of its customers' HELOCs, Defendants had an obligation to have a sound factual basis for concluding that the value of the homes had actually declined significantly. *See* 15 U.S.C. § 1647(c)(2)(B); 12 C.F.R. § 226.5b(f)(3)(vi)(A); FDIC June 26, 2008 Financial Institution Letter (FIL-58-2008), *Home Equity Lines of Credit, Consumer Protection and Risk Management Consideration When Changing Credit Limits and Suggested Best Practices*, 2. Instead, Defendants knowingly and intentionally used certain valuation methods that it claims represents the "industry standard," that falsely devalued Plaintiff's and Class members' properties in order to justify the blanket suspensions of the HELOCs. For instance, in Plaintiff's case, Defendants understated the value of the Subject Property by at least $14,000 or by nearly 10%.

B.    **Defendants use unlawful triggering events.**

42.    The Official Commentary to Regulation Z, 226.5b(f)(3)(i), provides that a bank may not impose "'triggering events' or responses that the regulation expressly addresses in a manner different from that provided in the regulation." Namely, "a contract cannot contain a provision allowing the creditor to freeze a line due to an insignificant decline in property value since the regulation allows that response only for a significant decline." The Official Commentary to 12 C.F.R. 226.5b(f)(3)(i).

43.    In direct violation of this requirement, Defendants' HELOC contracts contain a provision that purports to permit them to suspend the borrowers' HELOCs in the case of insignificant declines of their home values. (See Ex. B, Section 13(b)(i) of the HELOC Agreement.)

44.    Further, in direct violation of the prohibition on using unlawful triggering events, Defendants suspended Plaintiff's and the Class members' HELOCs in response to insignificant declines in home values (in Plaintiff's case, only a 2.2% (not 50%)

decrease in the unencumbered equity occurred at the time his HELOC suspension).

45.   Further, in direct violation of the prohibition on using unlawful triggering events, Defendants have used their policy establishing new CLTV ratios as a triggering event to suspend the HELOCs of those borrowers whose loans did not satisfy the new CLTV standards. For instance, in Plaintiff's case, Chase refused to reinstate Plaintiff's HELOC because his CLTV ratio did not satisfy Chase's new CLTV standard of 70%, not due to any change in the property value or available equity. (Ex. D.)

46.   Also, in direct violation of the prohibition on using unlawful triggering events, WAMU's HELOC Agreement purports to allow Defendants to suspend or reduce the HELOCs in the absence of a significant decline in Subject Property. Section 13(b)(1) of the HELOC Agreement gives Defendants discretion to

> suspend additional advances or reduce your Credit Limit during any period in which . . . [t]he value of the Property declines significantly below the value as determined by us at the time you applied for your Credit Line. This includes, for example a decline such that the difference between the Credit Limit and the available equity is reduced by fifty percent (50%) and may include a smaller decline depending on individual circumstances.

(Ex. B, Section 13(b)(1)). "Credit Limit" is defined as "a revolving line of credit in the amount of $17,000." Thus, in Plaintiff's case, the HELOC Agreement purports to allow the HELOC suspension when the difference between $17,000 ("Credit Limit") and $34,690 ("available equity") is reduced by 50%, i.e., by $8,845:

$$\text{(\$34,690 - \$17,000)} / 2 = \$8,845.$$

47.   Under Regulation Z, such a decline in property value is insignificant, since a 50% reduction in an unencumbered equity in Plaintiff's case amounts to $17,345:

**$34,690 /2 = $17,345.**

Thus, in direct contravention of Regulation Z, the HELOC Agreement expressly purports to permit suspensions and reductions of the HELOCs in the absence of a significant decline in the collateral property value.

C.      **Defendants did not have sound factual basis for suspending the HELOCs.**

48.      Before suspending their HELOCs, Defendants had an obligation to confirm with a sound factual basis that the value of each specific property had actually declined significantly and to suspend or reduce HELOCs only if, and only during a period where, there had been a significant decline in value of each property. *See* 15 U.S.C. § 1647(c)(2)(B); 12 C.F.R. § 226.5b(f)(3)(vi)(A); FIL-58-2008, p.2.

49.      Additionally, because a "significant decline" requires a consideration of the property's available (unencumbered) equity based upon the property's appraised value, Defendants had an obligation to calculate the available equity in each property in order to determine whether the property had actually declined in value significantly, within the meaning of Regulation Z. *See* the Official Staff Commentary to 12 C.F.R. 226.5b(f)(3)(vi), Section 6. Such a calculation necessarily required Defendants to determine the existence of any other mortgages or encumbrances on the property and, if so, whether the balance of any other such mortgages had actually decreased since the initial creation of the HELOC.

50.      Defendants violated TILA and Regulation Z by suspending Plaintiff's HELOC without first determining the level of available equity in Plaintiff's Subject Property, which had not significantly declined within the meaning of Regulation Z, due to a higher home value than determined by WAMU's AVM, and due to Plaintiff partially paying down the balance on his first mortgage.

51.      Defendants received and reviewed the independent appraisal of the Subject Property but failed or refused to reinstate Plaintiff's HELOC despite the fact their

suspension decision was cased on a flawed valuation and the correct value of the property did not constitute a significant decline warranting suspension.

52.     Defendants further disregarded the fact that Plaintiff has paid down his first mortgage even though Defendants were Plaintiff's first mortgage lender and thus knew or should have known the outstanding balance on Plaintiff's first mortgage at the time it suspended his HELOC. Specifically, Defendants knew but disregarded the fact that Plaintiff had paid down the balance of his first mortgage by over $6,000 since the HELOC origination, thereby increasing the unencumbered equity in the Subject Property by that amount. Further, on information and belief, Defendants failed to first determine the level of available equity in the respective properties of all Class members before suspending or reducing their respective HELOC accounts.

53.     Defendants violated TILA and Regulation Z by suspending Plaintiff's HELOC, and suspending or reducing those of the other Class members, in the absence of the "significant decline" in the value of the subject properties. Neither Plaintiff's property, nor on information and belief the property of the Class members, has significantly declined in value.

**D.     Defendants' notices of the HELOC suspension withhold necessary information from its recipients**

54.     Finally, Regulation Z requires that, where a creditor reduces a credit line or prohibits additional extensions of the credit limit, "the creditor shall mail or deliver written notice of the action to each consumer who will be affected. The notice must be provided not later than three business days after the action is taken and shall contain specific reasons for the action." 12 C.F.R. § 226.9(c)(3).

55.     In violation of Regulation Z, Chase notified Plaintiff and other Class members of the suspension of their respective HELOCs by letter that lacked sufficient information, including the specific reasons for the credit suspension action taken.

56.     The notice provided to Plaintiff and other Class members indicates that

"while we believe the updated property value to be accurate, if you dispute the value determination we offer an appeal process." (Ex. A.) However, the notice fails to provide HELOC customers with enough information to determine whether they should challenge the credit limit reduction or suspension by spending time and resources to obtain an appraisal. The notice does not even state that this new "updated property value" is so that the HELOC borrower could decide whether to appeal the suspension based on this new value.

57.     The notices likewise do not disclose (a) what Defendants considered to be the value of the property as of the date of the HELOC origination; (b) whether "this updated property value" represents a significant decline in value from the time of the HELOC origination; (c) how Defendants determine or even define "significant decline in value;" (d) how Defendants compute the value of the subject properties; (e) the methods or factors used by the AVM models; (f) the amount of available equity in the property and whether Defendants even considered or analyzed such equity; (g) the actual threshold property value that Defendants requires in order to reinstate or unfreeze the HELOCs; and (h) other necessary and material information.

58.     Damages or other remedies under TILA, as prayed for in this Complaint, would be inadequate to fully compensate Plaintiff and the Class members or would otherwise be inadequate to fully address Defendants' ongoing and future violations of TILA with respect to the Class members and future borrowers.

59.     The Class members and Defendants have adverse legal interests, and there is a substantial controversy between the Class and Defendants of sufficient immediacy and reality to warrant the issuance of a declaratory judgment as to whether Defendants' mass suspensions and reductions of the HELOCs, and the notice Defendants provided with respect to such suspensions and reductions, violate TILA and Regulation Z.

60.     Plaintiff, on his own behalf and on behalf of the other Class members,

seeks a declaratory judgment under 28 U.S.C. § 2201 that Defendants violated TILA and Regulation Z by: (i) suspending or reducing HELOCs despite the properties securing the HELOCs not having declined significantly and despite Defendants not having a sound factual basis for concluding that there had been any such significant decline; and (ii) providing inadequate notice with respect to their HELOC suspensions and reductions.

### COUNT II: DAMAGES FOR VIOLATION OF TILA AND REGULATION Z

61.     Plaintiff re-alleges the above paragraphs as if fully set forth herein.

62.     Defendants effectuated blanket suspensions of the HELOCs of Plaintiff and the other Class members by, upon information and belief, intentionally undervaluing the properties securing the HELOCs, despite the fact that the properties securing the HELOCs did not significantly decline in value, and despite the fact that Defendants had no sound factual basis for finding the existence of any such purported significant decline.

63.     Defendants' suspension or reduction of the credit limits for Plaintiff and other Class members' HELOCs violated TILA and Regulation Z.

64.     The properties securing the HELOCs of Plaintiff and the Class members did not significantly decline in value.  Defendants knowingly lacked a sound factual basis for concluding that the properties had declined in value significantly enough to support reducing the credit limits or suspending the HELOCs, especially because Defendants failed to consider the level of any primary mortgage in order to accurately determine available equity.

65.     In addition, Defendants invoked unlawful triggering event, in violation of Regulation Z, in claiming that their new policy setting more stringent CLTV ratios justified the suspension of the HELOCs falling outside the new CLTV standard.

66.     Defendants further violated TILA and Regulation Z by notifying Plaintiff and other Class members of the decline in their respective credit limits by a letter that lacked sufficient and necessary information, including the specific reasons for Defendants' actions.

17

67.     Defendants' violations of TILA and Regulation Z damaged Plaintiff and the other Class members.  These damages occurred in the form of denial of the full use of the HELOCs, appraisal fees, increased price of credit, adverse effects on credit scores, loss of interest, and other damages.

68.     Plaintiff, on his own behalf and on behalf of the other Class members, seeks actual damages under 15 U.S.C. § 1640(a)(1), statutory damages under 15 U.S.C. § 1640(a)(2)(B), and costs of the action, together with reasonable attorneys' fee under 15 U.S.C. § 1640(a)(3), in an amount to be determined at trial.

### COUNT III: BREACH OF CONTRACT

69.     Plaintiff re-alleges the above paragraphs as if fully set forth herein.

70.     Plaintiff and the Class members entered into standard form HELOC Agreements with WAMU and/or Chase, in conjunction with obtaining a HELOC from Defendants.  These HELOC Agreements constitute valid and enforceable contracts between Defendants and the Class.

71.     In accordance with the HELOC Agreements, Plaintiff and the Class members were each uniformly provided a line of credit which allowed Plaintiff and the Class to draw against their HELOCs for a set period of time.  (Ex. B.)

72.     The HELOC Agreements drafted by Defendants contain a provision that purports to give Defendants discretion to "suspend additional advances or reduce your Credit Limit during any period in which . . . [t]he value of the Property declines significantly below the value as determined by us at the time you applied for your Credit Line.  This includes, for example a decline such that the difference between the Credit Limit and the available equity is reduced by fifty percent (50%) and may include a smaller decline depending on individual circumstances."  (Ex. B., Section 13(b)(1) of the HELOC Agreement.)  To the extent this provision violates TILA and Regulation Z, it is invalid and should be stricken from the HELOC Agreements.

73.     Defendants materially breached the terms of the HELOC Agreements by

suspending or reducing Plaintiff's and other Class members' HELOCs where no significant decline in value had first occurred, by not having a sound factual basis to conclude otherwise, and by failing or refusing to consider the level of available equity in the properties securing the HELOCs.

74. In addition, Defendants materially breached the terms of their HELOC Agreements by suspending or reducing Plaintiff's and other Class members' HELOCs based on Defendants' new CLTV standards.

75. No provision of Defendants' HELOC Agreements allowed Defendants to suspend or reduce the HELOCs obtained under the HELOC Agreements because the Class members CLTV ratio does not satisfy Defendants' CLTV standard, particularly when Defendants' CLTV standard after the HELOC Agreement execution.

76. The credit limit under the Class members' HELOC Agreements, as well as the grounds on which Defendants could purportedly suspend or reduce credit limits, were material terms of the contract between Class members and Defendants.

77. Plaintiff and the other Class members made all payments due to Defendants and otherwise fully performed under their HELOC Agreements with Defendants.

78. As a result of Defendants' breach, Plaintiff and the Class members have suffered damages in the form of being denied the full use of their HELOCs, appraisal fees, the increased price of credit, lost interest, attorneys' fees, adverse effects on their credit score, and other damages.

79. Plaintiff, on his own behalf and behalf of the Class members, seeks actual and compensatory damages for Defendants' breach of contract in the amount to be determined at trial, plus reinstatement of the HELOCs that were suspended or reduced in breach of the HELOC Agreements, as well as interest, attorneys' fees and costs.

**COUNT IV: RESTITUTION FOR CONVERSION AND/OR UNJUST ENRICHMENT (IN THE ALTERNATIVE TO THE BREACH OF CONTRACT CLAIM)**

19

80.     Plaintiff re-alleges the above paragraphs as if fully set forth herein.

81.     In the alternative, and in the event this Court finds that no contract provision expressly governs the issues raised in this Complaint, Defendants have knowingly received and retained benefits from Plaintiff and the Class members under circumstances that would render it unjust to allow Defendants to retain such benefits.

82.     By utilizing inaccurate and unsubstantiated valuation models that did not provide particularized and accurate valuations of the properties of each Class member and by requiring the Class members to obtain and pay upfront for appraisals in order to seek reinstatement of their HELOCs (rather than require a request for reinstatement from the borrower, then perform their own investigation and only charge those bona fide fees so incurred, as required by Regulation Z), Defendants knowingly received and appreciated the benefits of up-to-date in-person appraisals on properties in which Defendants had security interests.  Such appraisals are more accurate than the AVM estimates utilized by Defendants, and it would be unjust for them to obtain and keep the benefit of the updated, accurate appraisals without bearing the cost of such appraisals.

83.     Additionally, Defendants have been unjustly enriched and/or converted Plaintiff's property by retaining money that should otherwise have been provided to customers as part of their HELOCs.  Defendants took undue advantage over the Texas homeowners by unlawfully and inappropriately reducing or freezing the credit limits of the Class members, thus allowing Defendants to utilize monies for their own purposes rather than for extending credit to Class members as previously promised.  It is unjust to allow Defendants to keep such a benefit in light of their actions in violation of TILA and Regulation Z and in light of the significant harm their actions caused the Class members and the economy, as a whole.

84.     As an actual and proximate result of its actions, Defendants have received and retained a benefit at the expense and detriment of Plaintiff and the Class members in the form of the up-to-date appraisals of properties in which they had security